United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOUIS A. PERRETTA, JR. and FRANK PERRETTA, individually and on behalf of all others similarly situated,

    Plaintiffs,

  v.

PROMETHEUS DEVELOPMENT CO., INC., a California corporation; SANFORD N. DILLER, an individual,

    Defendants.
_____/

No. C 05-02987 WHA

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

## INTRODUCTION

In this dispute over the merger of a partnership, defendants Prometheus Development Co., Inc. ("PDC") and Sanford Diller move to dismiss plaintiffs' class-action complaint. This order finds that plaintiffs have not satisfied the pleading requirements of FRCP 9(b). Defendants' motion, therefore, is **GRANTED**. Plaintiffs will not be given further opportunity to amend their complaint, it being futile.

## STATEMENT

On July 22, 2005, plaintiffs Louis A. Perretta, Jr. and Frank Perretta filed a complaint on behalf of former limited partners in Prometheus Income Partners, L.P. ("the Partnership"). On December 15, 2005, the Court granted defendants' motion to dismiss on grounds that plaintiffs failed to state a claim and that they failed to comply with the pleading requirements of

FRCP 9(b). Plaintiffs then filed their first amended complaint alleging a single claim for relief against PDC and Diller for breach of the fiduciary duties of loyalty, good faith, fair dealing and full and adequate disclosure relating to a merger of the Partnership.

The Partnership's holdings consisted of two apartment complexes located in Santa Clara, California (First Amd. Compl. ¶ 20). Diller was the president, chief financial officer and sole director of defendant PDC, the corporate-general partner of the Partnership (*id.* at ¶ 10). Diller and his wife held all of the outstanding shares of capital stock in PDC (*ibid.*).

In March 2002, PDC announced a proposal (renewed from a similar proposal made in 2000) for the merger of the Partnership into PDC's affiliate, PIP Partners (*id.* at ¶¶ 21, 23). By this merger, PIP Partners was to acquire the entirety of the Partnership's units at $1,714 per unit for a total transaction of $53,200,000, followed by a liquidation of the Partnership (*id.* at ¶ 23).

On June 13, 2002, PDC issued a proxy, filed with the Securities and Exchange Commission, setting forth the terms of the proposed merger (*id.* at ¶ 24). Over the following weeks, PDC made several supplemental filings to the proxy and one of the limited partners filed a counter proxy seeking to block the merger (Tricker Decl. Exhs. A–J). On July 24, 2002, 50.7 percent of the limited-partnership units voted to approve the merger, purportedly in reliance on the proxy materials (First Amd. Compl. ¶ 24). In the briefing on the motion to dismiss the original complaint, plaintiffs conceded that this vote constituted a majority of the unaffiliated partnership units. Plaintiffs, however, have alleged in the first amended complaint that this majority vote would not have been reached if Diller had not voted the shares of PIP Partners, an entity which he purportedly controlled and which held 18.2 percent of the limited-partnership units (*id.* at ¶ 25).

Plaintiffs now identify eight purportedly false statements or concealments in the proxy materials giving rise to their fiduciary-duty claim: (1) defendants misrepresented the cost to repair siding defects at the complexes, (2) defendants failed to disclose that the appraisal of the properties' value used for purposes of the merger assessment was outdated, (3) defendants failed to disclose or perform the services warranting a two percent brokerage commission,

(4) defendants improperly included a disposition fee without disclosing that the fee could not be exacted in the context of a merger, (5) defendants failed to disclose the extent of their negotiations with Aspen Square Management, a competitive bidder to PIP Partners, (6) defendants failed to disclose that a fairness opinion referred to in the proxy did not constitute an independent judgment, (7) defendants did not disclose that a prepayment penalty would be used by PIP Partners to pay the merger consideration or that PIP Partners should have borne the penalty, and (8) defendants did not disclose that the appraisal accounted for the needed siding repairs even though a litigation settlement of $10.8 million relating to the siding was being paid to PIP Partners (*id.* at ¶ 28).

In addition to the alleged misrepresentations in the proxy materials, plaintiffs maintain that defendants breached their fiduciary duties relating to the merger by recommending that the merger occur before completing the repairs, creating artificial pressure on the limited partners by withholding distributions and failing to negotiate in good faith with Aspen and failing to create a "bidding war" between Aspen and PIP Partners (*id.* at ¶ 32).

## ANALYSIS

### 1. LEGAL STANDARD.

A motion to dismiss under FRCP 12(b)(6) tests for legal sufficiency of the claims alleged in the complaint. A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). On the other hand, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). A court has discretion to grant dismissal without leave to amend if "it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc). That discretion is "particularly broad" where a court has previously given a party the opportunity to amend. *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002).

3

Additionally, FRCP 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This particularity requirement applies to claims for which fraud is not an essential element where:

> [T]he plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

*Vess v. Ciba-Geigy Corp. U.S.A.*, 317 F.3d 1097, 1103–04 (9th Cir. 2003) (internal citations omitted). Where FRCP 9(b) applies, the circumstances constituting the alleged fraud must "be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* at 1106.

**2.   REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE.**

Although materials outside of the pleadings ordinarily are not considered on a motion to dismiss, a court may consider matters properly subject to judicial notice. *See Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). A court may take judicial notice of any fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

Defendants seek judicial notice of all documents on file with the SEC regarding PIP Partners, in particular the proxy materials relating to the merger (RJN; Tricker Decl. Exhs. A–J). This order will not take notice of unidentified documents that happen to be on file with the SEC. Judicial notice is proper, however, of the specific proxy materials filed with the SEC and identified in defense counsel's declaration. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 863 (N.D. Cal. 2004). Such public documents, however, are judicially noticeable only for the purpose of determining what statements are contained therein, not to prove the truth of the contents. *See, e.g., Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001).

Moreover, this order may rely on the proxy materials because plaintiffs incorporated them by reference in their first amended complaint. The doctrine of incorporation by reference allows a court to consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's

4

pleading." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (internal citation omitted). Under this doctrine, the *Silicon Graphics* opinion found "it was proper to consider the SEC filings under the incorporation by reference doctrine." So too here.

### 3. BREACH OF FIDUCIARY DUTY.

California law, which governs here, provides that "[p]artnership is a fiduciary relationship, and partners are held to the standards and duties of a trustee in their dealings with each other." *Everest Investors 8 v. McNeil Partners*, 114 Cal. App. 4th 411, 424 (2003) (internal citation omitted). "[A] general partner of a limited partnership has the rights and powers and is subject to the restrictions of a partner in a partnership without limited partners." Cal. Corp. Code § 15643(a). "The fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care." Cal. Corp. Code. § 16404(a).

"A partner may not dissolve a partnership to gain the benefits of the business for himself, unless he fully compensates his copartner for his share of the prospective business opportunity." *McNeil*, 114 Cal. App. 4th at 424–425 (internal citation omitted). On the other hand, "[a] partner does not violate a duty or obligation under this chapter or under the partnership agreement merely because the partner's conduct furthers the partner's own interest." Cal. Corp. Code. § 16404(e). Moreover, as the December order explained, there is no breach of a partner's fiduciary duties with respect to a transaction involving partnership property:

> [I]f there has been a full and complete disclosure, if the partner who deals with partnership property first discloses all of the facts surrounding the transaction to the other partners and secures their approval and consent. . . . In fact, it would be incongruous to hold that a partner who consented to a partnership transaction, with full knowledge of all of the facts, may later complain and seek damages against the other partner simply because he benefitted by the transaction.

*Skone v. Quanco Farms*, 261 Cal. App. 2d 237, 241 (1968) (internal citations omitted).

Plaintiffs conceded in the briefing on the earlier motion to dismiss that a majority of the unaffiliated partnership units had approved the merger. Combined with the order's finding that the proxy materials disclosed sufficient facts about the merger *and* that plaintiffs made insufficient allegations of fraud to undermine those disclosures, plaintiffs' original complaint faltered under *Skone*.

5

Plaintiffs have since changed their tune, claiming that their concession about an unaffiliated majority was an inadvertent error by counsel. Plaintiffs have thus alleged in the first amended complaint that no unaffiliated majority existed because a portion of the partnership units approving the merger were in fact controlled by Diller.

According to plaintiffs' calculations, presented at oral argument, the vote did not bear out a majority consensus by the unaffiliated limited partners. There were 18,995 outstanding partnership units. For the merger to pass, a majority of all units (regardless whether affiliated or not) had to approve the merger (*i.e.*, 9,498 units). Plaintiffs concede that this much was explained in the proxy (Tricker Decl. Exh. E at 2) and they also concede that such a majority was reached. Indeed, 10,941 units voted in favor of the merger. According to plaintiffs, however, 3,798 of the approving units were controlled by Diller through PDC. This entails that only 7,143 of the unaffiliated partnership units voted in favor of the merger. Subtracting the units controlled by Diller/PDC, there were 15,197 total unaffiliated limited partnership units. 7,143 is less than a majority (47%) of that total.

There are two reasons that this order does not accept plaintiffs' new story.

*First*, the proxy materials contradict plaintiffs' method of counting the votes (*id.* Exh. F at 6):

> PIP Partners has agreed to vote neutrally with respect to the merger proposal, meaning that PIP Partners will vote its units for or against the proposal in the same proportion as the total number of units voted by unaffiliated limited partners.

Similarly (*id*. at 31) (emphasis added):

> Pursuant to the Amended and Restated Agreement and Plan of Merger, PIP Partners has agreed to vote its units for or against the merger in the same proportion as the unaffiliated limited partners who vote on the merger at the meeting. *This means that the merger will be approved only if a majority of those unaffiliated limited partners voting on the transaction vote for the merger*.

Plaintiffs have not alleged that these voting rules were violated. Had a majority of unaffiliated limited partners *voted against* the merger, the merger would not have passed.

What the parties vigorously disputed at oral argument is what it meant to "vote against" in this context. According to plaintiffs' view, a partnership unit voted against the merger by

6

1 voting "no," "abstain," *or by not voting at all*. The proxy materials, however, made clear that

2 such was not the effect of a non-vote (*id.* at 43) (emphasis added):

> If you mark "ABSTAIN" on your proxy and do not vote in person at the meeting, the effect will be the same as a vote against the merger proposal. *If you fail to return your proxy and do not vote in person at the meeting, as a result of the agreement of PIP Partners to vote as have the voting limited partners, the effect on the merger proposal will depend on how other limited partners vote*.

      In other words, according to the rules set forth in the proxy materials, a failure to vote was to be treated as just that—a failure to vote. While a unit which voted "abstain" would count as vote against approval, any non-voting units were deemed obsolete. An overwhelming majority of unaffiliated limited partners that *actually voted*, did so in favor of the merger and PIP Partners' units were voted accordingly. Only 2,248 of the unaffiliated units voted "no" and another 320 of the unaffiliated units voted "abstain." According to the clear rules set forth in the proxy, the merger passed with the approval of 73.5% the unaffiliated partnership units.

      Plaintiff has not indicated any authority dictating that the proxy's rules about non-votes were impermissible. Rather, plaintiff maintained at oral argument that the partnership agreement set the" rules of the game." The partnership agreement did not set specific rules about the effect of non-votes. According to the agreement, "'Majority Vote' shall mean the vote of the Limited Partners who are entitled to vote, consent or act and are holders of record of a majority of the outstanding Units" (Tricker Decl. Exh. F at B-1). "Limited Partners shall have the right, by Majority Vote to take the following action . . . [d]issolve and wind up the Partnership; . . . [a]pprove or disapprove the sale of either or both of the Properties" (*ibid.*). With respect to voting by proxy, "[t]he use of proxies in connection with this Article 10 will be governed in the same manner as in the case of the corporations formed under the California General Corporation Law" (*ibid.*). The Corporations Code also does not dictate a specific rule for how to count non-votes. Likewise, no California cases have established a rule that non-votes must be counted in a certain manner. Plaintiffs' theory about the merger vote simply lacks support.

7

*Second*, this order finds that, in any event, plaintiffs are judicially estopped by their earlier concession that an unaffiliated majority approved the vote. "Judicial estoppel, also known as 'preclusion of inconsistent positions,' prohibits a litigant from asserting inconsistent positions in the same litigation." *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 917 (9th Cir. 2001). Similarly, "statements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (emphasis in original). Our circuit has "restricted the application of judicial estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) (internal citation omitted). The December order clearly relied on plaintiffs' concession. Application of judicial estoppel seems particularly justified to prevent a party from taking an inconsistent position simply to evade otherwise inevitable dismissal. That appears to be the situation here, where the proxy materials indicated that the facts about the vote could not have been as plaintiffs alleged.

As the December order stated, however, plaintiffs still could survive dismissal and avoid *Skone* if they properly pled fraud with respect to the proxy materials. This entails pleading "the who, what, when, where and how" of defendants' allegedly deliberate misstatements in compliance with FRCP 9(b). *Vess*, 317 F.3d at 1106. Plaintiffs did not meet this burden in the original complaint and this order finds that plaintiffs have not remedied that deficiency.

As noted above, the first amended complaint identified eight specific misstatements in the proxy. All of these misstatements are attributed to PDC as general partner and Diller as *de facto* general partner—the "who." Moreover, plaintiffs specifically identified where in the proxy materials the particular misstatements or concealments occurred—the "when," "where" and "what." Plaintiffs, however, still failed to allege "how" the purportedly fraudulent statements were misleading.

Plaintiffs did not articulate how the appraisal was inadequate, instead making a conclusory statement that market conditions rendered the appraisal outdated. The limited partners were able to review the entire appraisal in the proxy (Tricker Decl., Exh. F. at C-2-1).

8

1    They could see when the appraisal was taken and were free to make their own assessments as to
2    the continued validity of the appraisal.  Indeed, the fairness opinion included in the proxy
3    identified the possible effect of changes in the real-estate market on the appraisal (*id*. at 84).
4    Similarly, the proxy materials indicated that the appraisal *was* exclusive of the estimated cost of
5    the siding repairs (*id.* at 75–76).  Plaintiffs have not alleged how that disclosure was false.

6    Plaintiffs also failed to adequately allege how the fairness opinion was biased, such that
7    defendants were required to disclose more than the details of that opinion as they did.  Indeed,
8    the proxy materials contained the entirety of the fairness opinion (*id.* at D-1-1, D-2-1).
9    Moreover, the proxy disclosed the background of the opinion, thus allowing the limited partners
10   to assess whether any bias was involved (*id.* at 80–81).

11   Plaintiffs also did not articulate how defendants made any fraudulent statements about
12   the real-estate-brokerage commission.  Defendants disclosed that they would take a two percent
13   commission in the proxy materials and that they had conducted an analysis of the
14   reasonableness of that percentage (*id*. at 89).  Plaintiffs have not articulated what more was
15   required of defendants to earn the commission.

16   Similarly, plaintiffs failed to allege any fraud with respect to the disposition fee.  The
17   details of the disposition fee were disclosed in the proxy and in the partnership agreement,
18   which itself was included in the proxy materials (*id*. at 89, B-1).  Plaintiffs could thus tell from
19   the proxy that PDC intended to exact a disposition fee in the context of the merger.

20   The proxy materials likewise disclosed the existence and nature of the prepayment
21   penalty (*id*. at 56).  The materials explained that the merger consideration was calculated after
22   giving effect to "the repayment (*including the applicable prepayment penalty*) of existing
23   mortgages on these properties" (*id*. at 5) (emphasis added).  Plaintiffs have not identified how
24   the use of that penalty was limited, such that PDC would have needed to disclose how the
25   penalty would be spent.  Plaintiffs' conclusion that the penalty "should have been borne by the
26   acquiring entity" lacks any supporting factual allegations.  Furthermore, regardless of the
27   accuracy of that conclusion, the limited partners nevertheless approved the merger with
28   knowledge from the proxy that *they* would bear the penalty.

9

1    The proxy materials also disclosed a rationale for conducting the merger prior to
2 completing repairs on the complexes (*id.* at 36, 41).  Plaintiffs have at most identified a
3 disagreement with that rationale, not how the reasoning was fraudulent.
4    Again, contrary to plaintiffs' allegations, the proxy materials indicated an intention to
5 make distributions in 2002 *if the merger was not consummated* (*id*. at 151–52):

> As of the date hereof, the partnership anticipates that as a result of having received all settlement proceeds in respect of ifs construction defects litigation, the partnership's cash reserves, including restricted and unrestricted cash on hand prior to receipt of the settlement proceeds, will be sufficient to enable it to begin distributions to limited partners during 2002. . . .  If the merger is consummated, you will receive no further cash distributions from or with respect to the partnership (other than the merger consideration).

Plaintiffs did not allege how this representation was false.  Plaintiffs also did not articulate how such a representation pressured plaintiffs to accept rather than reject the merger.

   Finally, plaintiffs have not described in sufficient detail how defendants were fraudulent with respect to the negotiations with Aspen, which seems to be plaintiffs' most significant gripe.  Defendants' correspondence with Aspen was disclosed and filed with the SEC (*id.* at Exhs. G–J).  Moreover, one of the limited partners submitted a competing proxy, which promoted the Aspen deal and sought disapproval of the PIP Partners deal (*id*. at Exh. I).  When deciding to vote in favor of the merger, the unaffiliated limited partners had ample information that the competing proposal existed.  If the limited partners determined that the Aspen proposal was more favorable, or if they wanted to decline both proposals and wait for a better future proposal, they could have done so.  Instead, the limited partners approved the merger with PIP Partners.

   Plaintiffs now have alleged in their first amended complaint that defendants did not disclose that they demanded payment of $1.5 million from Aspen to compensate for the lost sales commission and disposition fee that would be earned under the merger with PIP Partners.  The proxy materials flatly contradict this.  Aspen's letter of intent from July 22, 2002, filed with the proxy's supplemental materials, revealed the fact that defendants made various demands to Aspen including the $1.5 million general-partner payment (*id*. at Exh. J):

10

> We have done everything that you have asked of us as we sought to proceed with this transaction. Among other things, we offered a price substantially higher than PIP; at your request, we agreed to purchase the partnership interests as opposed to the properties; and finally, we agreed to pay Prometheus Development Co., Inc. $1.5 million for its general partnership interest, three times the amount being paid to the limited partners for equivalent interests, even though no justification for said $1.5 million price was ever offered.

This letter may have cast a negative light on the general-partner payoff. But plaintiffs cannot maintain that the details of defendants' demands on Aspen were not disclosed. With this information before them, a majority of the unaffiliated limited partners nevertheless approved the merger. They must live with that decision.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **GRANTED WITHOUT LEAVE TO AMEND**. Plaintiffs had an opportunity to resolve the deficiencies in their complaint and failed to do so. Judgment will be entered accordingly with this order.

**IT IS SO ORDERED.**

Dated: February 24, 2006.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE